## E. J. ALBRECHT CO. v. NEW AMSTERDAM CASUALTY CO.

No. 9329.

Circuit Court of Appeals, Seventh Circuit.

Nov. 1, 1947.

Rehearing Denied Dec. 17, 1947.

Hirsch E. Soble, of Chicago, Ill., for appellant.

Louis L. Dent, George M. Weichelt, John P. Hampton, Roger D. Doten, Donald W. Nofri, A. R. Peterson, Owen Rall and John R. Porter, all of Chicago, Ill., for appellee.

Before EVANS, MAJOR, and MINTON, Circuit Judges.

EVANS, Circuit Judge.

Plaintiff, a contractor, sued a subcontractor's surety for damages for breach of contract. The subcontractor intervened as a defendant and filed an answer and a counterclaim. The surety filed an answer advancing a plurality of defenses.

The jury found against plaintiff on its complaint and for the defendant on his counterclaim giving him a verdict for $15,000. A directed verdict in favor of the surety was entered at the close of the plaintiff's case, on the ground that the evidence showed there had been a material alteration

---

in the contract without its knowledge or consent.

Briefly, the evidence: In July, 1941, plaintiff contracted with the United States Government for the construction of a sizeable channel and rectification, protection project at Tuscarawas River, Massillon, Ohio [1] which project was to be started on ten days' notice, and be completed in 360 days. Work was actually begun in August, 1941, and completed June 14, 1944.

To complete this contract, plaintiff, on August 29, 1941, entered into a subcontract with defendant, Dushney. Dushney owned diesel and other trucks which were engaged in hauling excavated materials. He had negotiated before this, and completed, contracts with plaintiff, of a similar nature. (For another angle of the parties' litigation, see E. J. Albrecht Co. v. New Amsterdam Casualty Co., 7 Cir., 163 F.2d 16.)

Defendant furnished the required surety, September 24, 1941, in the amount of $40,000, and it is upon this bond that this action was predicated.

Defendant's trucks did a large amount of hauling in the fall of '41, from September 23 to December 23, at which date there was a cessation of work for the holiday season, and because of adverse weather conditions.

In 1942, Dushney made another contract with plaintiff wherein, as a subcontractor he agreed to excavate materials on a sizeable excavation project, at Berlin Center, Ohio. He took his trucks from the Massillon to the Berlin Dam project. Plaintiff and defendant decided plaintiff should hire other truckers to carry on the Massillon work while defendant used his trucks on the Berlin Dam project. The evidence is somewhat conflicting in its details but there is no question but that it was agreed defendant should remain on the Berlin job.

Defendant claims plaintiff said there would be a thousand dollar profit for him in such substitution of truckers, that he would be charged with the cost of the truckers and would receive his contracted-for credit for material hauled. The latter was done.

Defendant had no trucks at the Massillon project after May, 1942. The aforementioned substitute truckers worked there in '42.

In the spring of '43 the real trouble began. Plaintiff contends it repeatedly requested defendant to bring his trucks to Massillon. An impasse was reached, which according to defendant centered around a controversy over the building of a temporary (or completion of a permanent) bridge at Walnut Road in Massillon. This bridge, defendant says, would have permitted the use of his larger diesel trucks, which the city police had allegedly banned from traversing the city streets, in carting the dirt from one side of the river to the other.

Plaintiff, on the other hand, contends that the contract provision [2] for the construc-

---

[1] "1-01. Location. The site of the work * * * is within the corporate limits of the City of Massillon, Stark County, Ohio, located on the Tuscarawas River * * *.

"1-02. Work to be done.

"(a) The work provided for herein is authorized by the Flood Control Act approved June 28, 1938.

"(b) The work to be done consists of furnishing all plant, labor and materials (except as specified in par. 1-23) necessary for the improvement of the channel of the Tuscarawas River for Section 1 of the Local Protection Project, Massillon, Ohio, in strict accordance with these specifications and the drawings referred to in par. 1-04. It will consist of the following major items:

(1) Channel excavation for widening, deepening, and straightening of the Tuscarawas River * * *.

(2) Construction of levee embankment and appurtenances.

(3) Construction of one highway bridge with approaches.

(4) Constructing four railroad bridges.

(5) Relocating affected railroad tracks and facilities * * *.

(b) (6) Constructing * * * Engine Terminal and Wheeling & Lake Erie Railway Freight Terminal.

(7) Removal of abandoned track, bridges, and appurtenances.

(8) Construction of sewers, a portion of a siphon, culverts, and water lines."

[2] "Bridges and railroad crossings deemed necessary by the Contractor will be constructed by the Contractor without cost to the Subcontractor. The Subcontractor will be permitted to use such structures but it is understood that he does so at his own risk."

tion of a bridge was a matter wholly controlled by its decision. Plaintiff also points out that such a temporary bridge would have cost plaintiff a substantial sum, $7,000, as the river was 200 feet wide at the point in question. A temporary bridge, such as it had theretofore built for $300 at another —a narrow— point in the river, was out of the question here. The substitute truckers performed the haulage in smaller trucks over the city streets. Defendant argues that the use of smaller trucks increased the cost of hauling.

The plaintiff sought $19,906.61 damages, arriving at that sum in this manner:

$92,660—cost to plaintiff of work done, less

72,752

—————

$19,906.61

The $72,752 was the difference between $88,911.71, which Dushney would have earned under his subcontract, and $16,158.-32 which plaintiff paid out in defendant's behalf, in the execution of the work.

Defendant's amended counterclaim was for $35,000. This sum was stated to represent reimbursement for expenditures and a larger sum for lost profits. Precise itemization of the latter item does not appear. At this trial, however, defendant listed expenses in excess of $21,000 and an expected "value" (profit) of his subcontract at $40,500.

The evidence is conflicting as to conversations and negotiations had between plaintiff and Dushney in 1943. Plaintiff stresses its repeated requests, by phone and by letter, for completion of the project by Dushney. Dushney, on the other hand, states he did not receive some of the letters; that he made several visits to the project (sometimes on Sunday) to see how the work, and the bridge, were progressing. He contends he was entirely willing at all times to co-operate in completing the work. In view of the conflicts in the oral testimony we herewith copy parts of letters which passed between the parties.[3]

On the issue presented by the counterclaim it appears that Dushney relies largely,

[3] On February 1, 1943, plaintiff wrote to Dushney:

"Weather and other conditions permitting, it appears we should be in position to begin hauling excavated material on this project shortly after February 15th.

"It will be necessary to haul the excavated material east on Walnut Road to First Street, north on First Street to Tremont Avenue, west on Tremont Avenue to Fourth Street, and north on Fourth Street to the fill * * *.

"As you can see from this the trucks to be used will have to be licensed since they will be travelling over city streets. We suggest that some time within the next week or ten days it would be advisable for you to come to Massillon and discuss with us your plans for performance of this work. It appears now that once started this hauling can be continued regularly until completion of the work under this contract.

"Yours very truly,
E. J. Albrecht Company."

On February 27, Plaintiff wrote to Dushney:

"Under date of February 1, 1943, we notified you that your insurance * * * with New Amsterdam Cas. Co. would expire on February 14, 1943. We requested that evidence be furnished at once that the insurance has been extended.

"In the same letter we notified you that trucks would be needed for hauling excavated material some time after February 15, 1943 and asked to be advised as to what arrangements you were making to supply the trucks. Although four weeks have passed since the date of our letter, we have had no reply from you.

"We are serving notice on you at this time that unless you furnish trucks as required by your sub-contract, and unless you also furnish insurance as required thereby, at the time we resume excavation on this Project, we will proceed under the appropriate clauses of the subcontract.

"It is now estimated that excavation can be resumed about March 15, 1943 weather permitting.

"It is requested that you furnish us with an early reply setting forth your plans in regard to the completion of this work.

"Yours very truly,
E. J. Albrecht Company."

On March 10, 1943, Plaintiff wrote Dushney:

"Under date of February 1, 1943, and again on February 27, 1943, we notified you of our intention to resume earth

if not entirely, upon plaintiff's failure to build a bridge.

On this subject, the following pertinent excerpts appear in their contract:

"Bridges and railroad crossings deemed necessary by the contractor will be constructed by the contractor without cost to the subcontractor."

"The selection of the excavation areas and disposition of the excavation material shall be determined by the contractor and the sub-contractor agrees to abide by the decision so made."

The subcontractor also:—

"agrees and represents that he has inspected and familiarized himself with the premises in connection with which the work covered by this subcontract is to be performed * * * and further agrees and represents that he has examined and familiarized himself with the general contract between the contractor and the United States * * *

"The subcontractor shall maintain all haul roads including city, state and county roads used by him and shall repair any city, state or county road damaged by his operation * * *

"The work of constructing and removing temporary roads will be performed by the subcontractor without cost to the contractor insofar as the subcontractor's trucks and road maintenance equipment are needed for this temporary construction. * * *"

A permanent bridge structure had been begun by plaintiff at Walnut Road, over which Dushney believed a temporary deck could be laid so that his diesel trucks might be economically employed in the work. But the bridge was never brought to the stage of completion where he could have utilized it, and that was what he had been waiting for.

Plaintiff states that on pressing Dushney for immediate production of the trucks for use, Dushney finally said that some were on their way. When they failed to arrive he informed plaintiff the trucks had been involved in an accident. They never "showed up." Plaintiff decided to use the same

hauling on Massillon * * * Project * * * in the near future.

"In both letters we requested that you advise us as to what arrangements you were making for furnishing trucks as required by your Subcontract * * *. To date we have not received acknowledgment of our letters, nor have we received the information requested.

"This letter is final notice that unless positive assurance is received by March 16, 1943 that you have trucks available for our use, and propose to furnish them as required, we will take such action as is available to us under the appropriate clauses of the Sub-contract.

"Very truly yours,
E. J. Albrecht Company."

On May 1, 1943, Plaintiff wrote Dushney:

"Reference is made to our letter to you of March 10, 1943, in which we advised you that unless positive assurance is received by March 16, 1943 that you have trucks available for our use, and propose to furnish them as required, we will take such action as is available to us under the appropriate clause of the above sub-contract.

"We have not as yet received a reply to this letter nor have you furnished any trucks.

"You appeared at Massillon on or about April 16, 1943, and on some subsequent dates. Each time you stated that you would furnish trucks. About a week ago, you stated that trucks were on the way and should arrive in Massillon momentarily. We repeatedly advised you orally that hauling would have to commence not later than April 28, 1943, but thus far your trucks have not arrived.

"We want to be as reasonable as possible but your procrastinations must be brought to an end, as we have a contract to perform with the United States Government and our date of required completion is rapidly approaching.

"You are therefore notified that unless you proceed with the proper performance of the work in accordance with the provisions of the above subcontract within two (2) days after receipt of this letter, your employment will be terminated, and we shall in due course proceed against you for whatever damages we may sustain by reason of your violation of the subcontract.

"Very truly yours,
E. J. Albrecht Company."

On May 6, 1943, Dushney wrote to Plaintiff:

"I note your observation that you want to be reasonable, but any procrastinations must be brought to an end. I call your attention to the fact that under the contract I must be prepared for

truckers who had substituted for Dushney in '42, again in '43 and '44. The project was finally completed but without further help from Dushney.

The contested issues in this court are:

(1) The correctness of the directed verdict in favor of the surety company.

(2) The refusal of the trial court to direct a verdict in favor of the plaintiff on the counterclaim and the vulnerability, for lack of evidence, of the jury's verdict in defendant's favor on the counterclaim. Plaintiff insists that its alleged obligation (upon which defendant's counterclaim is predicated) was, under the contract, dependent on the good faith of plaintiff's determination that a bridge was not needed.

(3) The validity of the jury's verdict in defendant's favor on its counterclaim, in the face of defendant's contention that the contract was terminated. On the hypothesis of its not having expired, plaintiff argues there was no default and no damage.

(4) Trial errors, including rulings on evidence, instructions to jury, etc.

On the issue presented by the counterclaim it appears that Dushney relies largely, if not entirely, on plaintiff's failure to build a bridge. On this subject the parties contracted "Bridges and railroad crossings deemed necessary by the contractor will be constructed by the contractor without cost to the subcontractor."

■ Notwithstanding this language, we agree with the District Judge that the words of the contract "deemed necessary by the contractor" did not permit plaintiff whimsically to refuse to build a bridge. Its action was subject to the test of its fraud or bad faith in reaching its decision. If in bad faith, it refused to build a bridge for the subcontractor, it could not escape liability because of the words of the contract "deemed necessary by the contractor." National Grain Yeast Company v. City of Crystal Lake, 7 Cir., 147 F.2d 711; Fidelity Fuel Co. v. Martin Howe Coal Co., 7 Cir., 15 F.2d 470; Lewis Mfg. Co. v. Snyder, 6 Cir., 37 F.2d 299; Shepherd v. Union Central Life Ins. Co., 5 Cir., 74 F.2d 180;

equipment for this job by September 5, 1941, and to fully complete the work on or before July 1, 1942.
"* *

"However, I think if you would take a more reasonable attitude, we can work this job out to the complete satisfaction and profit to both of us.

"Otherwise I *will have to notify you that you have made performances by me impossible and disclaim any further obligations under the contract.*

"Furthermore, you mention that your completion date is rapidly approaching. I have not been informed when you are to complete the work, nor have I been informed when I am to complete the work under the subcontract or under the time therein set forth. This time is of course long since past.

"Very truly yours, * * * William Dushney."

On May 8, 1943, plaintiff wrote Dushney:

"Despite our numerous requests both written and oral that you proceed with the performance of the work in accordance with the provisions of the above subcontract, you have failed to do so.

"Even after our letter to you of May 1st, 1943, Mr. Fry on the evening of May 5th, 1943, 'phoned you that unless you commenced performance as requested

in that letter we would have no alternative but to terminate your employment.

"You have done nothing. You have disregarded the fact that our contract with the Government requires completion by a fixed date and imposes on us a heavy penalty for each day's delay.

"It is now clear that you do not intend to perform. As early as February 1, 1943, and a number of times since we notified you * * *.

"In view of your wrongful default we hereby terminate your employment under the above sub-contract and shall in due course proceed against you and your bonding company for whatever damages we will sustain by reason of your violation of the sub-contract.

"Very truly yours,
E. J. Albrecht Company."

On May 12, 1943, Dushney wrote to plaintiff:

"I want to make it now clear to you that I do intend to perform my contract, and I do not propose to let statements to the contrary in your letters to remain unanswered and uncontradicted.
* * *

"The main thing is that I objected to your jumping to any conclusions that I do not intend to perform the work there, as I have always complied with my contract and always intend to. * * *"
"Yours truly, William Dushney."

Williston on Contracts, (Rev'd Ed.) Sec. 675A; American Jurisprudence, "Contracts," Sec. 340.

This language, however, made the plaintiff the judge of the necessity of building bridges. As to the necessity or advisability of building any bridge, its decision was final and beyond dispute except for the single limitation that its determination must not be motivated by bad faith or in fraud of Dushney.

The importance of this distinction between reasonable action and bad faith action appears when we examine the evidence bearing on this issue. The court ruled, after hearing argument, that whatever discretion was vested in the plaintiff with respect to the building of a bridge would have to be reasonably exercised; that the subcontractor and surety could show what the conditions were and could contend that the discretion was not exercised reasonably.

■ We are convinced that there was no evidence of bad faith or fraudulent action on the part of the plaintiff. There was some evidence indicating that the expenditure of seven thousand dollars was unreasonable in view of the shortened distance which the material would have to be hauled.

And there is dispute as to the cost of a bridge. Also there was certainly sharp dispute over the usability of part of the route if the bridge were constructed and rain fell to make the new filled-in dirt track impassable. This is the point over which the parties differed. We might assume that they differed honestly as to the advisability of a bridge. But that is not the question here presented. The parties settled that question when they made their agreement.

They made their own contract. They did so after going over the situation personally, viewing the premises and considering the routes which could be taken to carry the material which was to be hauled.

They agreed in writing that the *contractor, the plaintiff*, was to be the sole judge of the necessity of the construction of a bridge. It was the contractor's judgment which was conclusive, subject only to bad faith or fraud on its part. Mistake of judgment is not the same as bad faith.

Our examination of the evidence leads to the conclusion that while there may have been dispute over the wisdom of plaintiff's action in not building a bridge, there was no controversy which called for submission to the jury of the plaintiff's bad faith.

The evidence clearly established these facts. The gain to the defendant from a bridge was dependent in a large degree on the condition of the weather. The nature of the ground over which the larger diesel engine trucks would have to travel if the shorter route were pursued (the same being fresh fill) made its use impossible in case of rainy weather. There existed a route traversable at all times which the truckers not only could use, but did use.

Moreover, Dushney, in a letter dated May 6, 1943, relied on the termination date of the contract, July 2, 1942, as the reason for not going on with his contract. He was the first to announce his refusal to proceed with the contract because "Neither have I been informed of any extension of time of my contract, and have not asked for any extension of time, and have been advised that I am no longer to furnish trucks for this job after July 1, 1942."

■ While there are earnest differences in the contentions of the parties, we think it quite clear from the record before us that there were no unsettled matters in the spring of 1943. At that date neither party had any valid claim against the other growing out of the work at Massillon. True, the work had not been completed. It is also true that Dushney had withdrawn his trucks from the Massillon project and taken them to the Berlin dam. His action in this respect was at plaintiff's request and as a subcontractor of plaintiff, who was the principal contractor at Berlin, as well as at Massillon. Surely plaintiff could not complain of defendant's breaching the Massillon contract when it was done to carry out his part of the Berlin dam project, and when defendant acted at plaintiff's request.

It is also true that the expiration date of the completion of the Massillon work had long since expired. That date may have been, and evidently was, extended by the Government, to plaintiff, but we think

it equally clear that Dushney was, in the spring of '43, no longer under legal obligation to carry out his contract made in 1941 and which was by its terms to be completed in July, 1942.

■ Up to the spring of '43, it is true, the relation of the parties was such that informality was characteristic of their agreement, their work and their understanding. In the spring of '43 there was a growing tensity, a touchiness in their relations. The Berlin Dam project seems to have been completed. There remained some work yet to be done at Massillon. The United States had not been insistent on the prompt completion of this Massillon project. We believe, however, there was ample evidence to support the verdict of the jury that Dushney owed nothing when the plaintiff sent its letter of May 8, wherein it said, "We hereby terminate your employment under the above subcontract."

Plaintiff's letter of May 8th, and defendant's letter of May 6th, terminated the contract, if indeed, it had not been long terminated before that date. At that time neither party was indebted to the other and thereafter neither party was under obligation to proceed further under their contract.

The motion to direct a verdict as to Dushney's Counterclaim should have been granted. Not only was there no jury question presented by the evidence as to plaintiff's bad faith in not building the bridge, as provided in this contract, but it was Dushney who first took the position that the contract was at an end by its own termination. This position led to plaintiff's announcement in its letter of May 8, "terminating Dushney's employment under the subcontract."

We are satisfied that both parties relieved the other of liability by their conduct and by these letters, save as Dushney might argue that he was excused for his termination of the contract by reason of plaintiff's failure to build a bridge. Dushney failed to establish a breach of contract by plaintiff in this respect. We therefore conclude there was nothing to go to the jury on the counterclaim.

The judgment is affirmed in so far as it applies to the court's dismissal of plaintiff's complaint and is reversed so far as defendant's counterclaim is concerned. The judgment in favor of New Amsterdam Surety Company, dismissing the complaint as to it, is

Affirmed.